USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7-20-09

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
TEAMSTERS AIRLINE DIVISION,

                          Appellant,                    09 Civ. 343 (PKC)

          -against-
                                                        MEMORANDUM AND ORDER

FRONTIER AIRLINES, INC.,

                          Appellee.
------------------------------------------------------------x

P. KEVIN CASTEL, District Judge:

          This is an appeal from the November 14, 2008 Order of the United States

Bankruptcy Court (Robert D. Drain, U.S.B.J.) granting the motion of Frontier Airlines,

Inc. ("Frontier") to reject its collective bargaining agreements ("CBAs") with the

Teamsters Airline Division of the International Brotherhood of Teamsters (the "Union").

The Bankruptcy Court's Order authorized Frontier to reject the agreements and to

implement the terms of a final CBA-modification proposal that Frontier submitted to the

Union during the rejection process.[1]  The Union argues that Frontier failed to satisfy the

statutory requirements for rejection and that, for this reason, the Bankruptcy Court Order

authorizing rejection cannot stand.

---

[1] Frontier initially sought to reject its CBAs with three bargaining units: (1) the aircraft "appearance agents" and maintenance cleaners; (2) the aircraft technicians, ground service equipment technicians and tool room attendants (mechanics); and (3) the material specialists. The Bankruptcy Court specifically excepted the "appearance agents" from its final Order in response to the parties' expressed desire to continue negotiating alternative solutions. See Joint Appendix, at A 5, A 55-56 (Order Granting Frontier Airlines, Inc.'s Motion to Reject Collective Bargaining Agreements with Teamsters Airline Division Pursuant to 11 U.S.C. § 1113, dated Nov. 14, 2008, at Exhibits A & B); see also A 57-58 (Notice of Frontier Airlines, Inc.'s Motion to Reject Collective Bargaining Agreements with the Teamsters Airline Division Pursuant to 11 U.S.C. § 1113).

Section 1113 of the Bankruptcy Code, 11 U.S.C. § 1113, sets forth the standards for determining whether a debtor-in-possession ("DIP") may assume or reject a collective bargaining agreement.[2]  This Court concludes that the Bankruptcy Court erroneously applied section 1113's standards when it based its finding under section 1113(c)(1) on the contents of a modification proposal fashioned after the commencement of the section 1113 hearing.  The Court also concludes that the Bankruptcy Court may have improperly considered Frontier's mid-hearing disclosures when it found that Frontier had satisfied its disclosure obligation under section 1113(b)(1)(B).  In reaching these conclusions, the Court notes that the Bankruptcy Judge exercised extraordinary diligence in his efforts to promote a negotiated resolution of this matter both during and after the hearing.  Those efforts were proper and commendable but, under the regime established by section 1113, proposals and supporting disclosures made by a party after the rejection hearing has begun may not form the basis for concluding whether the section 1113 standard has been satisfied, except, perhaps, where the parties expressly agree that they may be considered.

The Order of the Bankruptcy Court is vacated and the case is remanded for further proceedings consistent with this opinion.

I.      Background

        A.      The Section 1113 Motion

Frontier filed a voluntary petition under Chapter 11 on April 10, 2008.  (A 58.)  According to Frontier's Chief Operating Officer, the immediate cause of Frontier's bankruptcy filing was a demand for increased collateral by its main credit card processor.  (A 100-01.)  The company also suffered from a "liquidity crisis brought about by the

---

[2]  The full text of section 1113 is attached for reference at Appendix A.

combination of rapidly rising fuel costs, aggressive competition in Frontier's main market (Denver, Colorado) and, more generally, excess capacity in the airline industry." (Id.)

Shortly after its April 2008 filing, Frontier began negotiating with the Union for temporary modifications to the CBAs. The stated purpose of Frontier's request for modification was to facilitate DIP financing. (A 270.) On May 24, 2008, the Union and Frontier reached an interim agreement on modifications that extended through September 26, 2008. (A 270-74.)

On July 29, 2008, Frontier contacted the Union to propose long-term modifications to the existing CBAs. (A 128-29; A 146-52.) In its letter to Union representative Matthew Fazakas, Frontier explained its need for additional concessions as follows: "Now that Frontier has secured DIP financing, it is necessary to secure long-term wage, work rule and benefit reductions in order to allow Frontier to restructure and to eventually emerge from bankruptcy as a viable enterprise." (A 148.) Frontier attached an initial proposal to its July 29 letter that suggested numerous modifications to the Union's agreements with Frontier, including the insertion of a new sub-paragraph into Section 3 of the Maintenance and Material Specialists Agreement that would permit Frontier to subcontract all or part of its heavy maintenance work, including "C-Check" maintenance procedures. (A 151.) Frontier subsequently provided the Union with financial information to support its proposal.

The parties met for five negotiating sessions on September 4, 5, 9, 10 and 11 but did not reach a final agreement on Frontier's modification proposal. (Union Br. at 4-5; Frontier Br. at 8-9.) By motion dated September 12, 2008, Frontier moved for an order from the Bankruptcy Court authorizing it to reject the CBAs and to impose the

terms of its modification proposal.  (A 57-60.)  Frontier requested that the Bankruptcy

Court postpone any hearing on its motion until October 3, 2008 so that the parties could

"continue their efforts to reach a settlement of [the] [m]otion."  (A 59.)  Frontier

submitted a revised, pre-hearing modification proposal to the Union on September 24,

2008.  (A 310.)

The Bankruptcy Court commenced the rejection hearing on October 3 and

held continued sessions on October 10, 16 and 17.  The parties continued to negotiate

after the first hearing session and Frontier produced a third modified proposal to the

Union.  (A 787-89; Oct. 10 Tr. at 228-34.)[3]  On October 17, the Bankruptcy Court

instructed both sides to return on October 24 for an oral ruling on Frontier's motion.  (A

611-12; Oct. 17 (p.m.) Tr. at 951-52.)  The Court also urged the parties to continue

negotiating, and it asked both parties to submit letters summarizing the status of their

negotiations and the contents of their latest proposals by October 23, 2008.  (A 603-04;

Oct. 17 (p.m.) Tr. at 865-66.)  At the continued hearing on October 24, the Bankruptcy

Court reviewed those October 23 submissions and concluded that the parties had

narrowed the gap between their respective proposals considerably.  (A 616-18; Oct. 24

Tr. at 2-4.)  According to the Court, the parties' primary outstanding disagreement

concerned the appropriate level of operational protection to Frontier (i.e. freedom to

outsource) under a proposed maintenance employee furlough system.  (Id.) The Court

commented that:

---

[3] The parties' Joint and Supplemental Appendices contain only selected portions of the transcript to the
October 2008 proceedings before the Bankruptcy Court.  At the Court's request, counsel has forwarded the
complete transcripts—which date from October 3, October 10, October 16-17, October 24 and October
31—to Chambers.  The Court has included citations to both the Appendix and the corresponding transcript
page wherever possible, but cites exclusively to the transcript when referring to material not included in the
parties' original Appendix submissions.

> [I]f I were someone with the power to direct people to
> negotiate, I would direct them to negotiate over those
> issues. But I don't really have that power. I can't make
> them negotiate or concede points. And, ultimately, I'm
> supposed to rule if the parties don't want to negotiate
> further.
>
> Frankly, it seems to me that the parties run the risk of
> simply getting an advisory ruling that's similar to what I've
> just said, though. And so I'm going to ask you all whether
> you want the ruling or whether you want to pursue those
> points further, which I think, notwithstanding the back-and-
> forth in the letters, the parties can make further progress on.

(A 620; Oct. 24 Tr. at 6.)  Following a brief recess, both parties agreed to continue

negotiating for another week in lieu of receiving the Court's final ruling. (A 624; Oct. 24

Tr. at 18.)  The parties also agreed to submit a second set of status letters in advance of

their reconvening on October 31. (Id.)  The parties submitted new updates on October 30

and included revised modification proposals with their submissions. (A 867-917.)

On October 31, 2008, the parties reconvened before the Bankruptcy Court.

The Court reviewed the contents of the parties' latest update letters. It criticized Frontier

for failing to stay focused on the two central objectives of its negotiation:  reduced

operating costs and limited exposure to employee attrition under a furlough system. (A

635-36; Oct. 31 (a.m.) Tr. at 39-40.)  It also commented that the Union had asked

reasonable questions about Frontier's proposals and that Frontier's negotiators did not

appear to have answered those questions fully. (A 642; Oct. 31 (a.m.) Tr. at 46.)  The

parties continued negotiating during a mid-day break in the hearing and, at the afternoon

session that day, Frontier presented its sixth revised modification proposal to the Court.

(A 650; Oct. 31 (p.m.) Tr. at 4.)  Frontier informed the Court that the Union had rejected

the new proposal and that, in Frontier's opinion, the Union would not agree to

outsourcing of C-Check maintenance work under any circumstances. (A 650-51; Oct. 31 (p.m.) Tr. at 4-5.)  The Court questioned Frontier's counsel about the substance of the new revisions (A 661-67; Oct. 31 (p.m.) Tr. at 15-21), and then afforded counsel for the Union an opportunity to discuss its remaining concerns. (A 667-86; Oct. 31 (p.m.) Tr. at 21-40.)  The Court then summarized its own understanding of the revised proposal, including certain additional changes that Frontier had consented to on the record in its afternoon colloquy with the Court. (A 686-92; Oct. 31 (p.m.) Tr. at 40-46.)  On the afternoon of October 31, the Court delivered its oral ruling from the bench. (A 699-730; Oct. 31 (p.m.) Tr. at 53-84.)  The Court issued its final, written decision on November 14, 2008.

B.      The Bankruptcy Court Decision

          In its decision, the Bankruptcy Court highlighted two features of section 1113 that are relevant to this appeal.  First, the Court discussed whether it properly could consider revisions to a debtor's initial modification proposal which were made during the course of the section 1113 hearing.  The Court concluded that, although the text of section 1113(b)(1) contemplates an initial proposal prior to the debtor's motion for section 1113 relief, the statute's good-faith negotiation requirement indicates that Congress "did not intend the Court to focus solely on the initial proposal to be made by the debtor prior to the filing of the application." (A 29.) (emphasis in original).  The Court continued:

> "[I]t is also clear in the Second Circuit, and the better view under the statute's plain meaning and purpose, that if the parties are, in fact, continuing to bargain in good faith during the course of the hearing, the court should consider the ultimate proposal made by the debtor, which may be made during the course of the hearing, or before the

> hearing's conclusion, and not insert the word 'commencement' into [s]ubsection 1113(c)(1) with regard to which proposal should be evaluated. Congress knew how to focus the court on the 'commencement' of the hearing, as it did in [s]ubsections (d)(1) and (d)(2); it didn't do so when it referred to the debtor's proposal in [s]ubsection (c)(1)."

(A 29-30.)

The Bankruptcy Court also discussed the scope of a debtor's disclosure obligation under section 1113(b). The Court reasoned that, although a debtor's disclosures must be sufficient to substantiate its position, the specific form and content of such disclosures will necessarily vary. (A 31-34.) The Court concluded that Frontier had provided sufficient, relevant information to the Union.

The Court reviewed the evolution of Frontier's proposals regarding wage cuts and outsourcing, and it commented that Frontier's second, third, fourth and fifth revisions to the initial modification proposal—the last three of which were made during the hearing—had "significantly narrowed the differences between the two parties." (A 44.) The Court noted that, during the week prior to October 31, Frontier had engaged in a "constructive dialogue" with Union economists, and it highlighted specific revisions to the company's final proposal that addressed outstanding Union concerns. (A 47-48.) The Court also summarized three remaining objections from the Union and determined that the Union's demands in those areas could not reasonably be accommodated under the circumstances. (A 48-53.) The Court concluded its decision as follows:

> So, in light of the foregoing, and, in particular, in light of the last proposal by the debtor, which was made on the record at this hearing, and only consistent with the imposition of that proposal, I would authorize the debtor to reject the [Union] agreements with the exception of the

7

appearance agents' collective bargaining agreement (which I understand the parties still want to continue to negotiate).

My view is that it is still valuable to the debtor to reach consensus with its union workers, and I would like the debtor to continue to try to achieve that consensus, but, based upon its last proposal, the debtor has, I believe, carried its burden under [s]ection 1113 to reject the [Union] agreements and implement its last three year . . . proposal as it pertains to the [Union] employees, with the exception of the appearance agents.

(A 55-56.)

      C.    Subsequent Procedural History

Following entry of the Bankruptcy Court's final order, the Union filed a timely notice of appeal to this Court on November 21, 2008. See Dkt. No. 1; Frontier Br. at 14. On June 1, 2009, this Court issued an Order (Dkt. No. 26) directing both parties to submit, by letter brief, written responses to five questions regarding the issue of waiver. Pursuant to the same Order, the Court heard oral argument on June 30, 2009.

II.    Legal Standards

      A.    Standard of Review

This Court has jurisdiction over of the Union's appeal under 28 U.S.C. § 158(a)(1). The Court reviews the Bankruptcy Court's conclusions of law de novo and its factual findings for clear error. N.Y. Typographical Union No. 6 v. Maxwell Newspapers, Inc. (In re Maxwell Newspapers, Inc.), 981 F.2d 85, 89 (2d Cir. 1992).

      B.    Rejection Under Section 1113

Section 1113 empowers a debtor-in-possession to reject a collective bargaining agreement if the Bankruptcy Court determines that rejection is necessary to the debtor's successful reorganization and the balance of the equities clearly favors

8

rejection.  In re Northwest Airlines Corp., 483 F.3d 160, 166 (2d Cir. 2007) (citing 11 U.S.C. §§ 1113(a), (b)(1)(A) and (c)(3)).  To make such a determination, the Bankruptcy Court must specifically find that:  (i) the debtor has made a proposal to its employees that provides for CBA modifications necessary to permit reorganization; (ii) the debtor has provided its employees with "such relevant information as is necessary to evaluate the proposal;" and (iii) the authorized employee representative has refused to accept the debtor's proposal without good cause.  Id.  The Bankruptcy Court conducts its inquiry at an open hearing, as provided in subsection (d)(1).  Section 1113 expressly prohibits a debtor from terminating or modifying a collective bargaining agreement absent compliance with these requirements.  11 U.S.C. § 1113(f).

In addition to its substantive requirements, section 1113 outlines a sequence for the debtor's pre-rejection efforts.  Prior to seeking rejection, the debtor must make its initial proposal for CBA modifications and must provide adequate information from which to evaluate the proposal to its union counterpart.  Id. at § 1113(b)(1).  Following this exchange, and until the start of the section 1113 hearing, the debtor must meet and confer with the union in good faith, in order to attempt to agree on mutually satisfactory modification terms without Bankruptcy Court intervention.  Id. at § 1113(b)(2).  This sequence establishes a finite disclosure and negotiation period and, in so doing, sets in motion an "expedited form of collective bargaining with several safeguards designed to insure that employers [do] not use Chapter 11 as medicine to rid themselves of corporate indigestion."  In re Northwest Airlines Corp., 483 F.3d at 179-80 (Jacobs, C.J., concurring) (quoting Century Brass Prods., Inc. v. United Auto., Aero. &

Agric. Implement Workers of Am. (In re Century Brass Prods., Inc.), 795 F.2d 265, 272

(2d Cir. 1986)).  An order authorizing CBA rejection under section 1113 is thus:

> implicitly the product of negotiations (successful or
> unsuccessful).  The [section 1113 rejection] process
> ensure[s] that well-informed and good faith negotiations
> occur in the market place, not as part of the judicial
> process.  Reorganization procedures are designed to
> encourage such a negotiated voluntary modification.
> Knowing that it cannot turn down an employer's proposal
> without good cause gives the union an incentive to
> compromise on modifications of the collective bargaining
> agreement, so as to prevent its complete rejection.  Because
> the employer has the burden of proving its proposals are
> necessary, the union is protected from an employer whose
> proposals may be offered in bad faith.

Id. at 180 (quoting In re Maxwell Newspapers, Inc., 981 F.2d at 90) (second alteration in

original).

III.    Discussion

     A.    Section 1113(c)(1) does not permit rejection based upon a modification
          proposal made after the debtor's application to reject.

Section 1113(b)(1) requires a debtor to make its initial proposal for

necessary CBA modifications "prior to filing an application seeking rejection."

Subsection (c)(1) instructs the Bankruptcy Court to approve rejection if, "prior to the

hearing," the debtor has made a proposal that "fulfills the requirements of subsection

(b)(1)."

There is no serious dispute that, prior to making its application to reject

the CBAs, Frontier submitted an initial modification proposal to the Union for review.

The issue presented here is whether the Bankruptcy Court could properly base its ruling

under subsection (c)(1) on proposals made after the application to reject and before the

announcement of the Court's ruling on October 31.

i. The issue is not resolved by prior precedent.

This Court's reading of existing case law leads to the conclusion that the section 1113 timing issues raised on this appeal are not governed by controlling precedent. However, some of the case law is helpful to an understanding of the issues.

One Bankruptcy Court opinion, reviewed and affirmed by the Second Circuit, discusses section 1113's timing provisions as setting "a fixed point in time" for the Court's proposal review:

> The Court is to consider a debtor's proposal only to the extent the proposal was made prior to the commencement of the rejection hearing. Code § 1113(c)(1). It is only sensible that the court have a fixed point in time to look to as otherwise the court would be trying to deal with a constantly moving target as a debtor altered its proposal during the course of the trial.   Likewise, a union's prehearing position should be the focus of the trial. . . . For the court to judge a debtor's proposal on grounds articulated by a union for the first time at trial is to permit the union to do that prohibited to the debtor and would defeat Congressional intent that prehearing negotiations be fostered.

In re Royal Composing Room, 62 B.R. 403, 407 (Bankr. S.D.N.Y. 1986). The discussion of section 1113(c)(1) timing in In re Royal Composing Room was not, however, central to the Bankruptcy Court's holding. When the Second Circuit affirmed, it noted that: "[o]n appeal, the union . . . narrowed the focus of its attack on Royal's proposal" and argued only that Royal had "failed to show the necessity for eliminating priority." In re Royal Composing Room, 848 F.2d 345, 347 (2d Cir. 1988). The Second Circuit opinion does not address the issue of which among Royal's multiple, pre-hearing proposals should have been reviewed by the Bankruptcy Court, 848 F.2d at 358 (Feinberg, C.J., dissenting), and it had no occasion to consider the relevance of mid- or post-hearing

11

proposals to a section 1113 analysis. The Second Circuit's decision in In re Royal Composing Room is not controlling precedent on the issue of statutory construction before this Court.[4]

Two other cases from the Second Circuit have discussed the problem of late revisions to a debtor proposal. In In re Maxwell Newspapers, Inc., the Court reinstated the Bankruptcy Court's rejection order after concluding that the Bankruptcy Court's findings under subsection (c)(2) were not clearly erroneous. The Court's decision focused in part on whether the union had "good cause" to refuse a final negotiation offer where that offer had been tendered on the eve of the parties' section 1113 hearing. The Second Circuit rejected the district court's conclusion that the late timing of the final, pre-hearing offer had given the union cause to refuse it. The Court explained its analysis as follows:

> The district court reasoned, in addition, that the statute covers not only the contents of an employer's proposed modification of a labor contract, but also how the offer is made. It ruled because the offer was made on October 21—on the eve of the bankruptcy hearing—and on a take-it-or-leave-it basis, the union had no meaningful opportunity to consider and make a counter-proposal. . . . We reverse the district court's ruling not only on the contents of the rejection order but also concerning the manner in which [debtor's potential purchaser] made his final offer to the union. First, Local No. 6 did not complain that it had too little time to respond to the employer's proposal made on October 21. In addition, parties to collective bargaining agreements routinely negotiate for

---

[4] The Tenth Circuit has cited In re Royal Composing Room during a discussion of whether one debtor's mid-hearing comments should have been considered a separate, proposed modification. See In re Mile Hi Metal Sys., Inc., 899 F.2d 887, 893 (10th Cir. 1990). The Tenth Circuit did not, however, base its decision in that case on this issue. Instead, the Court concluded that its own reading of section 1113 conflicted with the district court determination that: (1) failure to consider allegations of illegal modification proposals amounted to legal error by the Bankruptcy Court; (2) section 1113(b)(1)(A) requires minimal, "absolutely necessary" modification proposals by a debtor seeking to reject; and (3) inclusion of a wage differential that would amount to an unfair labor practice rendered the debtor's proposal inequitable under section 1113(b)(1)(A), justifying union refusal to consider the proposal. Id. at 889, 891-93.

> many hours under imperative deadlines. In that negotiating universe, ten hours is ample time to consider and respond to a proposal. Consequently, the bankruptcy court correctly concluded that Local No. 6 rejected the employer's proposal without good cause.

981 F.2d at 90, 91. The Court also added a caveat to its decision:

> Having ruled in debtor's favor, we hasten to add that our judgment is conditioned on the continuation of offers recently negotiated between the parties, represented to us in open court at the time of oral argument. . . . [T]hose offers the debtor made to the union that were on the bargaining table as of December 17, 1992 are not now to be withdrawn.

981 F.2d at 91-92. Maxwell Newspapers acknowledges that "imperative deadlines" are a common feature of the labor negotiation context. True, the Court required that a proposal fashioned after the close of the rejection hearing, i.e. as of the date of oral argument in the Court of Appeals, be kept open. The direction was not hinged to the Court's section 1113 analysis. The Court's section 1113 analysis focuses on whether the union refused a modification without good cause because the proposal was made close in time to the start of the hearing. The Court's opinion does not address whether a Bankruptcy Court may base its finding under subdivision (c)(1) on the contents of a post-application or mid-hearing proposal.

In one reported Bankruptcy Court decision in this District, the debtor, Northwest Airlines, sought to reject a CBA with its flight attendants after that union's membership failed to ratify a negotiated settlement approved by union representatives. In re Northwest Airlines Corp., 346 B.R. 307 (Bankr. S.D.N.Y. 2006). Northwest's motion to reject was initially based on a proposal fashioned two weeks prior to filing, but the company made significant revisions to the structure of its "ask" during the negotiations

and hearing that followed.  In his decision authorizing rejection, Bankruptcy Judge Gropper specifically noted that he had scheduled the hearing to accommodate continued negotiations between the parties "even while evidentiary hearings went forward," and that the parties had agreed to formulate their "'final § 1113 proposals' only after the negotiation process had been given every opportunity to succeed." Id. at 316-17. Judge Gropper also kept the hearing record open after the close of oral testimony "for further negotiation and, if agreement could not be reached, the receipt of final proposals." Id. at 317. He authorized rejection only after continued negotiations following the end of the eight-day evidentiary hearing failed to produce an agreed solution.

   Judge Gropper's decision in <u>Northwest Airlines</u> includes an extensive discussion of section 1113's time limits.  During his review of Northwest's disclosure and bargaining efforts, Judge Gropper noted that (i) both parties agreed, at an early stage, to vary "the strict time limits built into § 1113," "in order to permit negotiations to continue and perhaps bear fruit," and that (ii) both agreed that section 1113's tests would be applied to their final proposals. 346 B.R. at 325.  This procedure, he concluded, was "consistent with many cases that have applied the § 1113 tests to proposals made during the course of trial or even on appeal." Id. (citing <u>In re Maxwell Newspapers</u>).  Judge Gropper also rejected a contention by union counsel that the Bankruptcy Court "must limit its consideration to the offers made at the very outset of the negotiation process and prior to the filing of the Motion." Id. at n.19.  That assertion, he commented, was "contrary to the express agreement of the parties in th[e] case as well as the purpose of § 1113, which is to encourage negotiation between the parties." Id.

14

Neither party appealed Judge Gropper's order granting authorization to reject the CBA and impose the terms of Northwest's final, unratified modification agreement. When Northwest later imposed those approved terms, the union's successor informed Northwest that its members intended to strike. Northwest moved to enjoin the strike. The Second Circuit ultimately upheld the district court's decision to reverse Judge Gropper and grant a preliminary injunction precluding work stoppage. As part of its decision, the Second Circuit reviewed the basic requirements of section 1113 but did not specifically discuss the parties' treatment of pre-rejection proposals.

Fairly read, there is no controlling precedent on whether section 1113(c)(1) permits consideration of proposals made after the filing of an application to reject or during the section 1113 hearing. In the absence of such precedent, this Court must interpret the language of the statute.

  ii. <u>Plain Meaning Analysis</u>

The method by which a court should proceed to interpret a statute is well-understood. "When interpreting a statute, the first step . . . is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case. [The Court's] inquiry must cease if the statutory language is unambiguous and the statutory scheme is coherent and consistent. Further, [t]he plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." <u>Virgilio v. City of New York</u>, 407 F.3d 105, 112 (2d Cir. 2005) (second alteration in original; citations and internal quotation marks omitted).

As noted, section 1113(b)(1) requires the debtor to make its proposal for necessary CBA modifications "[s]ubsequent to filing a petition and prior to filing an application seeking rejection."  Section 1113(c) provides that "[t]he court shall approve an application for rejection of a collective bargaining agreement only if the court finds that-- (1) the trustee has, prior to the hearing, made a proposal that fulfills the requirements of subsection (b)(1) . . . ."

As used in subsections (b)(1) and (c)(1), the phrase "prior to" fixes the point in time at which a trustee or debtor must act.  "[P]rior to" is a prepositional phrase that means "in advance of."  See MERRIAM-WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY UNABRIDGED, available at http://mwe.eb.com/mwu (last accessed July 14, 2009).

The phrase "[s]ubsequent to filing a petition and prior to filing an application" is also reasonably precise and clear in its meaning.  The trustee or debtor must make an initial, compliant proposal after the Chapter 11 petition has been filed and before it moves to reject.

An examination of the phrase "prior to the hearing" in the context of the entirety of section 1113 confirms the conclusion that the phrase means before the hearing and not during the hearing.  Subsection (b)(2) instructs the debtor to confer in good faith with its union counterpart once an initial modification proposal has been made. The period for good faith negotiations begins on the date the proposal is made but lawmakers have also provided for an ending point of the negotiations, i.e. the date of the hearing:

> During the period beginning on the date of the making of a
> proposal provided for in paragraph (1) and ending on the

16

> date of the hearing provided for in subsection (d)(1), the
> trustee shall meet, at reasonable times, with the authorized
> representative to confer in good faith in attempting to reach
> mutually satisfactory modifications of such agreement.

11 U.S.C. § 1113(b)(2) (emphasis added).

The phrase "ending on the date of the hearing provided for in subsection (d)(1)" read in the context of (d)(1) means ending on the date the hearing commences. Subsection (d)(1) instructs the court to "schedule a hearing" within fourteen days of a debtor's application and to provide adequate notice of "at least ten days before the date of such hearing." 11 U.S.C. § 1113(d)(1). These scheduling and notice requirements have meaning in the context of the date on which a hearing begins. Reading the scheduling and notice requirements to apply to each day of a multi-day hearing is an unreasonable construction. The Court concludes that the phrase "ending on the date of the hearing," as used in subsection (b)(2), is intended to have the same meaning as "a hearing" and the "date of such hearing" in subsection (d)(1), i.e. the starting date of the hearing.

Lawmakers reasonably could make the conscious choice to create artificial, temporal pressure to encourage the parties to bring their negotiations to a successful conclusion. Knowing that the start of a hearing is days or hours away tends to focus the attention of the parties.[5] Subsection (d)(1) permits the Court to "extend the time for the commencement of such hearing" if the circumstances of the case or the interests of justice so require. Id.[6] Thus, if negotiations have become promising, the

---

[5] "Depend upon it, sir, when a man knows he is to be hanged in a fortnight, it concentrates his mind wonderfully." J. Boswell's The Life of Samuel Johnson.

[6] The use of the phrase "extend the time for the commencement of such hearing" in subsection (d)(1) may potentially hold a clue to the meaning of the phrase "prior to the hearing" in subsection (c)(1). Certainly, if

Court may delay the ending date for such negotiations. If the debtor has a mid-hearing change of heart, it can withdraw its application and reset the section 1113 clock. Of course, the parties are always free to reach a consensual resolution at any point in the process, including during or after a hearing or ruling.

Giving the words "prior to the hearing" and "ending on the date of the hearing" their plain meaning also permits judicial fact-finding to be focused upon a fixed, rather than moving, target. Section 1113(c) requires a Court to determine whether a proposal meets the statutory criteria in subsection (b)(1) and whether subsequent negotiations have been in good faith. Judicial evaluation of proposals which are shifting during the course of a hearing is at least unwieldy.

Proposals that are made after the debtor's application for rejection but prior to commencement of the hearing play an important part in the statutory scheme. They are relevant to the statute's good-faith negotiation requirement and to whether a union has good cause to reject the debtor's proposal. See 11 U.S.C. §§ 1113(b)(2) and (c)(2). Inadequate proposals made during the negotiation period could doom the debtor's application because they may reflect a failure to negotiate in good faith. Nevertheless, the proposal which is scrutinized for compliance with subsection (b)(1)(A) is the initial proposal made prior to the pre-hearing negotiations that follow.

---

the statute had used both "prior" and "commencement" in the same phrase (e.g., "prior to the commencement of the hearing"), the potential for an ambiguity would have been eliminated. But the use of the term "commencement" in connection with adjourning the start date of the hearing does not imply that a different meaning should be ascribed to "prior to the hearing" as a term limiting the time for making a proposal which may be considered at the hearing. This Court concludes that this is not an instance of a more precise term connoting an intentionally different meaning than a less precise term.

18

### iii.    Legislative History and Other Sources

Both parties have cited legislative history and public policy goals to support their respective readings of section 1113's terms. See, e.g., Union Br. at 32; Frontier Br. at 19. For the reasons outlined above, the Court concludes that a review of legislative history is unnecessary given the plain text of section 1113. See New York v. U.S. Dep't of Health and Human Servs., 556 F.3d 90, 97 (2d Cir. 2009) ("To ascertain Congress's intent, we begin with the statutory text because if its language is unambiguous, no further inquiry is necessary. Only if we determine that Congress has not directly addressed the 'precise question at issue' will we turn to canons of construction and, if that is unsuccessful, to legislative history 'to see if those "interpretive clues" permit us to identify Congress's clear intent.'") (citations omitted).

Nevertheless, neither party has cited to legislative history which sheds light on the particular phrases at issue. Section 1113's legislative history has been criticized by several courts as less than illuminating. See 7 COLLIER ON BANKRUPTCY ¶ 1113.01 (15th ed. rev. 2008), at 1113-7 ("Courts also have commented that the limited legislative history available is not especially helpful. As the Bankruptcy Appellate Panel for the Eighth Circuit observed, 'Congress provided courts with no meaningful legislative history to interpret and apply the statute's substantive, often ambiguous terms.' The Court of Appeals for the Tenth Circuit described the limited legislative history that is available as 'little more than self-serving statements by opposing partisans. No committee reports were issued on the statute, apparently because no agreement on content could be reached.'" (citing United Food & Commercial Workers Union v. Family Snacks, Inc. (In re Family Snacks, Inc.), 257 B.R. 884, 891 (B.A.P. 8th Cir. 2001), In re

Mile Hi Metal Sys., Inc., 899 F.2d 887, 890 (10th Cir. 1990), and In re Hoffman Bros.

Packing Co., 173 B.R. 177, 182 (B.A.P. 9th Cir. 1994))).

          At least one commentator has reasoned that Congress anticipated evolving

proposals when it inserted the "good faith" and "good cause" requirements in

subdivisions (b)(2) and (c)(2), which allow a bankruptcy court to consider the negotiation

process as a whole and avoid limiting its review to pre-application events. See id. at ¶

1113.04[1][a], 1113-26–1113-27:

> [T]he requirement that the trustee bargain with respect to its proposal suggests that Congress was aware of the fact that the trustee's initial proposal might be changed pursuant to the collective bargaining process. Some courts have held that they should not consider oral statements made at the hearing regarding new proposals. The courts have been reluctant, however, to create hard line rules in circumstances where the exigencies of bankruptcy might place a premium on flexibility and responsiveness. [. . .] The overall requirement for "good faith" bargaining by the trustee and "good cause" for the union's refusal of a proposal allows the court ample opportunity to review the entire bargaining process without adopting a fixed rule on which proposals may be considered. This is consistent with the intent of section 1113 to put the burden on the parties to continue bargaining so that the union and the employer can have as much opportunity as reasonably possible to resolve their dispute without court intervention.

(citations omitted). Notably, however, Collier's analysis relies principally on the same

case law discussed above, and it concludes as follows: "It seems clear that the court is

not confined to the trustee's original proposal but is allowed to consider the sufficiency of

the last offer by the trustee before commencement of the hearing on the motion to reject

the collective bargaining agreement." Id. at 1113-25–1113-26. Thus, the guidance

offered by this respected treatise is equivocal on the subject at hand.

B.    Section 1113 does not permit rejection based upon debtor disclosure efforts made during the section 1113(d) hearing.

Section 1113 also requires a debtor to "provide . . . the representative of the employees with such relevant information as is necessary to evaluate the [debtor's modification] proposal." 11 U.S.C. § 1113(b)(1)(B). The debtor must make this disclosure "subsequent to filing a petition and prior to filing an application seeking rejection."

The Union argues that Frontier failed to provide "any information or analyses on the improvement or cost savings [it] required to emerge from bankruptcy" in advance of its September 12 motion to reject. (Union Br. at 23.) The Union also contends that Frontier's post-application disclosures were inadequate, and that the Bankruptcy Court "erred in condoning Frontier's failure to provide information until after it moved to reject the [Union] collective bargaining agreements and even after the commencement of the hearing." (Id. at 23-25.) For reasons similar to those discussed above, this Court concludes that the timing clause in subsection (b)(1) limits review of a debtor's disclosure effort to the time period "prior to filing an application seeking rejection." The Court must now consider whether the Bankruptcy Court's review exceeded this limit.

The record indicates that the Union challenged the adequacy of Frontier's initial disclosure in its October 16 motion to dismiss. See, e.g., Oct. 16 (a.m.) Tr. at 470-71. In response to that motion, the Bankruptcy Court expressed significant skepticism about Frontier's pre-application effort. See, e.g., id. at 483 ("It seems to me Congress in 1113 recognized the need for expeditious bargaining. . . . And, therefore, it required the employer to be more forthcoming, to take the union, in essence, by the hand and say, this

is what we need. I don't see that happened here."); id. at 494 ("The judge says to someone, you lose or you win, and that's why I think Congress required this basic information, the basic cards to be laid on the table: We need this. I don't see where you guys said, we need this from you. . . . And it may be a pyrrhic victory that the union wins because I think you've probably provided the information now, so you could start tomorrow with a new hearing. But I don't see it having happened so far. . . . Not with the proposal. It happened in dribs and drabs during bargaining. It happened on the stand."). The Court also emphasized that section 1113(b)(1)(B) appeared to locate the debtor's disclosure obligation during the period prior to the filing of a motion to reject. See id. at 518-19 ("[T]he issue I have is whether there's any case that says that information provided after the filing of the application can be used to satisfy (b)(1)(B). . . . [I]t seems to me that you don't have to do it with the proposal, but before you file your 1113 motion you have to do it. . . . I want to know what information you all provided before the petition—before the—I'm sorry, before the motion was filed."); id. at 520 (responding to an argument by Frontier counsel that the hearing should have been conducted on September 24 and that the Court should take the hearing's extension into account when evaluating Frontier's disclosure efforts) ("If you had had this hearing on September 24th, you would have lost on September 25th."); Oct. 16 (p.m.) Tr. at 527-28 ("[The Union] contends here that the record is undisputed and will remain undisputed that prior to the filing of the application the debtor did not provide it with fundamental information regarding the proposal that was in the debtor's possession. . . . I believe that it is clear from Mr. Christie's testimony, as well as Mr. Cox's, Mr. Cox being the

financial adviser to the company from Seabury, and also from Mr. Collins that the

union's contention as far as it goes is, in fact, correct.")

Nevertheless, the Bankruptcy Court denied the Union's motion to dismiss

and commented as follows about the parties' ongoing information-sharing efforts:

> I take both parties at their word that while this trial is
> ongoing, they will continue to want to refine their proposals
> and share information [to] see if, in fact, they can have a
> meeting of the minds, and the fact that I hope this trial will
> be done by the end of the day tomorrow would not unduly
> prolong the process. If, at the end of the day, I concluded
> that, after having heard the union and any rebuttal, the
> information requirement ultimately was not met, you would
> have lost another day, in other words. So it seems to me
> that it's better to hear the whole case and then decide.

Id. at 534-35.

In its oral ruling two weeks later, on October 31, the Bankruptcy Court

revised its earlier assessment of Frontier's disclosure. Citing Collier, the Court reasoned

that "[s]ince the primary purpose of the statute is to encourage the parties to negotiate and

to facilitate voluntar[y] modifications, it does not matter that the information was

provided pre-petition, so long as sufficient information has been provided." (Oct. 31

(p.m.) Tr. at 63.) "[I]t is clear to me," the Court continued, "that there is a burden, under

the statute, for the debtor to, throughout the process, including at the very beginning,

provide the union with all relevant and necessary information, and that the failure to do

so may not only trigger a problem under [s]ection 1113(b), but also in respect of the

good-faith bargaining requirement." Id. (emphasis added). The Court concluded that:

"the debtor has provided sufficient information to the [Union] during the course of the

negotiations, including in connection with its initial proposal to enable the union to test

and confirm this conclusion, that presently, Frontier is in very serious financial

difficulties." Id. at 66 (emphasis added). The Court then summarized Frontier's initial disclosure, but specifically noted that Frontier had supplemented that disclosure with additional information. Id. ("During the course of the negotiations, following the filing of the 1113 application, the debtor also made available to the union, without interference or restriction, an active or manipulable copy of the business plan, and I believe has been responsive to questions by the union with regard to aspects of the business plan, and with regard to the debtor['s] financial predicament."); see also id. at 71-72 ("I believe, given the company's serious financial predicament, . . . that such information, as an initial matter, was sufficient. The company followed up, as I said, with additional information, including providing an active version, or access to an active version of the business plan, and I believe, although the company may not have been as creative in responding to the union's counterproposals as one would wish, that the company has been appropriately forthcoming in sharing information.").

Despite its earlier misgivings, the Bankruptcy Court ultimately found that Frontier's disclosure to the Union was adequate and complied with section 1113(b)(1)(B). But the Court's findings of fact do not make clear whether its conclusion was premised upon the record of disclosures made prior to the time of Frontier's motion to reject or whether, instead, the Court considered Frontier's cumulative disclosure, including exchanges made during the section 1113 hearing period itself.[7] Because the text of section 1113(b) requires a debtor to make adequate disclosures before filing an application to reject, a remand is appropriate to allow the Bankruptcy Court to clarify its findings.

---

[7] It may be that post-hearing disclosure could shed light on the adequacy of pre-motion disclosures.

C.     The Union's objection to the consideration of information and proposals
       exchanged during the rejection hearing was properly preserved.

Frontier has argued, in both its written and oral submissions to the Court,

that the Union's conduct during the section 1113 hearing amounted to a waiver of any

legal error claim based on the Bankruptcy Court's consideration of mid-hearing

developments. See Frontier Br. at 17; Letter dated June 15, 2009 from B. Kaminetzky, at

8-9; June 30 Oral Argument Tr. at 15-18, 21-22.   Specifically, Frontier argues that,

"[h]aving actively participated in this [post-commencement negotiation] process before

the Bankruptcy Court without objection, it is disingenuous for the [Union] to now say

that the entire process was meaningless and urge reversal of the Bankruptcy Court's order

because it considered subsequent proposals." (Frontier Br. at 17.)

The law is well established that if, "as a tactical matter," a party raises no

objection to a purported error, such inaction "constitutes a true 'waiver' which will

negate even plain error review." United States v. Quinones, 511 F.3d 289, 321 (2d Cir.

2007), cert. denied, 129 S.Ct. 252 (2008) (citations omitted).   "A finding of true waiver

applies with even more force when . . . defendants not only failed to object to what they .

. . describe as error, but they actively solicited it, in order to procure a perceived . . .

benefit."  Id.  This doctrine of "invited error" is a branch of the doctrine of waiver by

which courts "prevent a party from inducing an erroneous ruling and later seeking to

profit from the legal consequences of having the ruling set aside.  Having induced the

court to rely on a particular erroneous proposition of law or fact, a party in the normal

case may not at a later stage of the case use the error to set aside the immediate

consequences of the error."  Ford v. County of Grand Traverse, 535 F.3d 483, 490-91

(6th Cir. 2008) (quoting Harvis v. Roadway Express Inc., 923 F.2d 59, 61 (6th Cir.

1991)).  The burden of establishing an implied waiver falls on the party asserting the waiver theory.  Mooney v. City of New York, 219 F.3d 123, 131 (2d Cir. 2000).

In response to Frontier's challenge, the Union asserts that its continued efforts to reach a negotiated solution during the section 1113 hearing should not be interpreted as a waiver of section 1113's express requirements.  According to the Union, "[t]he fact that the Union continued to bargain to reach a modified collective bargaining agreement does not indicate waiver of the statutory requirements of § 1113 any more than a defendant's decision to negotiate a settlement indicates waiver of its defenses in litigation."  (Union Reply Br. at 12.)

Based upon this Court's review, aided by argument of counsel, the record does not establish the intentional relinquishment of a known right by the Union.  True, the Union did not object to the introduction of Frontier's Third Modified Proposal on October 10, 2008, (Oct. 10 Tr. at 233) and it reintroduced the same document, along with its own counterproposals, in its written submissions to the Bankruptcy Court on October 14, 2008.  See A 409-36 (Second Supplemental Declaration of William Wilder, with exhibits); see also June 30 Oral Argument Tr. at 25-27.  As noted above, the Union also participated in extensive, mid-hearing negotiations, and it submitted written summaries of those efforts to the Bankruptcy Court for review in advance of the Court's October 31 ruling.

But, unlike in Northwest Airlines, the record of the hearing does not reflect an express consent by the parties to vary "the strict time limits built into § 1113," 346 B.R. at 325.  Nor does the transcript demonstrate that the parties expressly agreed to prepare final, revised proposals which would supersede all prior versions for purposes of

26

the Bankruptcy Court's review.  At the end of the October 17 session, Bankruptcy Judge

Drain stated that: "the factual record of this hearing is closed, although . . . since I'm not

going to rule for a week, I will give you all, as Judge Gropper did in <u>Northwest Airlines</u>,

a week for further bargaining.  And if there is any result from that, i.e., any proposals

made or the like, you can summarize those proposals to me and/or introduce them before

I rule." (A 603; Oct. 17 (p.m.) Tr. at 865.)  Thus, the Bankruptcy Court closed the factual

record on October 17, but expressly requested further written submissions to update the

Court on any continuing negotiations "before [it] rule[d]." <u>Id.</u>  The Bankruptcy Court's

hearing was kept open through October 31 for this limited purpose.  The Bankruptcy

Court's discussion of ongoing negotiation efforts during the section 1113 hearing did not,

however, clearly signal its intent to incorporate those discussions into its ruling on the

motion to reject.  Indeed, at an earlier point in the hearing, the Bankruptcy Court cited the

limits of section 1113 in encouraging both sides to negotiate a resolution of the case.

<u>See</u>, <u>e.g.</u>, Oct. 10 Tr. at 249-51 ("[A]t the risk of becoming too active in this, let me say

the following:  Part of, I think, the parties' concern about engaging in more give-and-take

from these proposals is their concern that there's a backdrop of my ruling based on your

give-and-take.  And there's a concern that each of you has that you're being backed into a

corner of, you know, if I propose, you know, alternatives to this, will it be perceived by

the Court as, you know, not fitting into the criteria of 1113. . . .  On the other hand, the

statute is drafted in a way that seems to set a timetable for what the Court actually

considers.  <u>It considers proposals that are made initially, and it considers proposals that

are made up to the date of the hearing.</u> . . .  And my hope is that parties will work

together to focus on the true cost savings of outsourcing and parameters for protecting

27

Frontier from not being able to meet its C-check deadlines and come up with something, right?  I think you can without fear of affecting this particular litigation.") (emphasis added).  The Bankruptcy Court also emphasized, during its solicitation of post-October 17 status updates, that further submissions would not be considered evidence for purposes of the Court's section 1113 ruling.  See Oct. 17 (p.m.) Tr. at 866 (instructing both sides to submit summaries of their continued negotiations in letter form and explaining that "[i]t doesn't have to be filed because they're negotiations"); Oct. 24 Tr. at 28 (repeating earlier instruction that letter updates on the status of negotiations be submitted prior to reconvening on October 31) ("And, again, I'm not taking evidence on this, so the proposals will speak for themselves.").  Relying in part on these comments, the Union has argued that it could not have anticipated the Bankruptcy Court's use of mid-hearing proposals, and that the independent purpose of its mid-hearing effort was: (i) to continue seeking a negotiated resolution with Frontier independent of the hearing process; and (ii) to highlight the potential impact (and necessity) of Frontier's pre-hearing proposals during the Court's rejection review.  (Letter dated June 15, 2009 from M. Goldstein-Robbins, at 3-5.)

Upon review of the entire record below, the Court concludes that although the Union did participate without reservation in continued negotiations following commencement of the hearing, there was no tactical decision by the Union to invite or abide legal error in anticipation of appeal.  The record does not establish an affirmative agreement by the Union to rely on final, post-hearing proposals in opposing Frontier's motion to reject.  Similarly, the record does not establish that the Union abandoned its

argument concerning inadequate informational disclosures by Frontier.   This Court concludes that the legal error was properly preserved for review.[8]

IV.    Conclusion

For the foregoing reasons, the Order of November 14, 2008 is vacated and the matter remanded to the Bankruptcy Court.  The Bankruptcy Court is left with the discretion on remand to make findings based on the existing record, reopen the record or take other action not inconsistent with this Memorandum and Order.  Any further appeal from the proceedings on remand should be assigned to the undersigned.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
       July 20, 2009

---

[8]  In reaching its conclusion about the waiver of section 1113's procedural requirements, this Court need not consider whether, for example, it would have been permissible for the parties to reach a stipulation, approved by the Bankruptcy Court, that proposals made after the start of the hearing be considered by the Court in concluding whether the statute had been satisfied.  No such agreement was reached in this case.

Appendix A

11 U.S.C. § 1113. Rejection of collective bargaining agreements

(a) The debtor in possession, or the trustee if one has been appointed under the provisions of this chapter, other than a trustee in a case covered by subchapter IV of this chapter and by title I of the Railway Labor Act, may assume or reject a collective bargaining agreement only in accordance with the provisions of this section.

(b)(1) Subsequent to filing a petition and prior to filing an application seeking rejection of a collective bargaining agreement, the debtor in possession or trustee (hereinafter in this section "trustee" shall include a debtor in possession), shall--

    (A) make a proposal to the authorized representative of the employees covered by such agreement, based on the most complete and reliable information available at the time of such proposal, which provides for those necessary modifications in the employees benefits and protections that are necessary to permit the reorganization of the debtor and assures that all creditors, the debtor and all of the affected parties are treated fairly and equitably; and

    (B) provide, subject to subsection (d)(3), the representative of the employees with such relevant information as is necessary to evaluate the proposal.

    (2) During the period beginning on the date of the making of a proposal provided for in paragraph (1) and ending on the date of the hearing provided for in subsection (d)(1), the trustee shall meet, at reasonable times, with the authorized representative to confer in good faith in attempting to reach mutually satisfactory modifications of such agreement.

(c) The court shall approve an application for rejection of a collective bargaining agreement only if the court finds that--

    (1) the trustee has, prior to the hearing, made a proposal that fulfills the requirements of subsection (b)(1);

    (2) the authorized representative of the employees has refused to accept such proposal without good cause; and

    (3) the balance of the equities clearly favors rejection of such agreement.

(d)(1) Upon the filing of an application for rejection the court shall schedule a hearing to be held not later than fourteen days after the date of the filing of such application. All interested parties may appear and be heard at such hearing. Adequate notice shall be provided to such parties at least ten days before the date of such hearing. The court may extend the time for the commencement of such hearing for a period not exceeding seven

30

days where the circumstances of the case, and the interests of justice require such extension, or for additional periods of time to which the trustee and representative agree.

(2) The court shall rule on such application for rejection within thirty days after the date of the commencement of the hearing. In the interests of justice, the court may extend such time for ruling for such additional period as the trustee and the employees' representative may agree to. If the court does not rule on such application within thirty days after the date of the commencement of the hearing, or within such additional time as the trustee and the employees' representative may agree to, the trustee may terminate or alter any provisions of the collective bargaining agreement pending the ruling of the court on such application.

(3) The court may enter such protective orders, consistent with the need of the authorized representative of the employee to evaluate the trustee's proposal and the application for rejection, as may be necessary to prevent disclosure of information provided to such representative where such disclosure could compromise the position of the debtor with respect to its competitors in the industry in which it is engaged.

(e) If during a period when the collective bargaining agreement continues in effect, and if essential to the continuation of the debtor's business, or in order to avoid irreparable damage to the estate, the court, after notice and a hearing, may authorize the trustee to implement interim changes in the terms, conditions, wages, benefits, or work rules provided by a collective bargaining agreement. Any hearing under this paragraph shall be scheduled in accordance with the needs of the trustee. The implementation of such interim changes shall not render the application for rejection moot.

(f) No provision of this title shall be construed to permit a trustee to unilaterally terminate or alter any provisions of a collective bargaining agreement prior to compliance with the provisions of this section.